1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                         DISTRICT OF ARIZONA

10

11  **Marcy Rich,**                    )

12                **Plaintiff,**        )        **2:14-cv-00213 JWS**

13          **vs.**                     )        **ORDER AND OPINION**

14  **Arizona Regional Multiple Listing** )      **[Re: Motion at Docket 47]**
    **Service, Inc.,**                  )
15                                      )
                    **Defendant.**       )
16  _____ )

17

18                      **I.  MOTION PRESENTED**

19          At docket 47, defendant Arizona Regional Multiple Listing Service, Inc.

20  ("ARMLS") moves for summary judgment against plaintiff Marcy Rich ("Rich") pursuant

21  to Federal Rule of Civil Procedure 56.  It supports its motion with a statement of facts at

22  docket 48.  Rich opposes at docket 54 and supports her opposition with a controverting

23  statement of facts at docket 55.  ARMLS replies at docket 56.  Oral argument was not

24  requested and would not assist the court.

25                       **II.  BACKGROUND**

26          Rich has been an ARMLS employee since 2002.  Her lawsuit against ARMLS

27  alleges two causes of action pursuant to Title VII of the Civil Rights Act of 1964.  Claim

28  one alleges that ARMLS has subjected her to disparate treatment and a hostile work

environment based on her Jewish religion; claim two alleges that ARMLS retaliated

1  against her for filing a Charge of Discrimination with the Equal Employment Opportunity

2  Commission ("EEOC").

3  ### III.  STANDARD OF REVIEW

4  Summary judgment is appropriate where "there is no genuine dispute as to any

5  material fact and the movant is entitled to judgment as a matter of law."[1]  The

6  materiality requirement ensures that "only disputes over facts that might affect the

7  outcome of the suit under the governing law will properly preclude the entry of summary

8  judgment."[2]  Ultimately, "summary judgment will not lie if the . . . evidence is such that a

9  reasonable jury could return a verdict for the nonmoving party."[3]  However, summary

10  judgment is mandated under Rule 56 "against a party who fails to make a showing

11  sufficient to establish the existence of an element essential to that party's case, and on

12  which that party will bear the burden of proof at trial."[4]

13  The moving party has the burden of showing that there is no genuine dispute as

14  to any material fact.[5]  Where the nonmoving party will bear the burden of proof at trial

15  on a dispositive issue, the moving party need not present evidence to show that

16  summary judgment is warranted; it need only point out the lack of any genuine dispute

17  as to material fact.[6]  Once the moving party has met this burden, the nonmoving party

18  must set forth evidence of specific facts showing the existence of a genuine issue for

19

20  [1]Fed. R. Civ. P. 56(a).

21
22  [2]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

23  [3]*Id.*

24  [4]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing former Rule 56(c), which
states that summary judgment "shall be rendered forthwith if the pleadings, depositions,
25  answers to interrogatories, and admissions on file, together with the affidavits, if any, show that
there is no genuine issue as to any material fact and that the moving party is entitled to a
26  judgment as a matter of law.").

27  [5]*Id.* at 323.

28  [6]*Id.* at 323-25.

trial.[7]  All evidence presented by the non-movant must be believed for purposes of summary judgment and all justifiable inferences must be drawn in favor of the non-movant.[8]  However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[9]

## IV.  DISCUSSION

### A.  Hostile Work Environment

Count one of Rich's complaint alleges that ARMLS managers Matthew Consalvo ("Consalvo") and Barbara Hoffman ("Hoffman") created a work environment that is hostile to Jewish employees.[10]  Hostile work environment claims fall within Title VII's protections against discrimination.[11]  In order to prevail Rich must establish that (1) she was subjected to "verbal or physical conduct of a harassing nature;" (2) this conduct was unwelcome; and (3) "the conduct was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."[12]  ARMLS argues that it is entitled to summary judgment because Rich cannot establish the third element—that ARMLS' conduct was so offensive that it altered the conditions of Rich's employment and created an abusive working environment .

When determining whether a plaintiff has presented sufficient evidence of abusive conduct, courts employ "a totality of the circumstances test" that considers the

---

[7]*Anderson,* 477 U.S. at 248-49.

[8]*Id.* at 255.

[9]*Id.* at 248-49.

[10]Doc. 1 at 8-9.

[11]*Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993).

[12]*Pavon v. Swift Transp. Co.*, 192 F.3d 902, 908 (9th Cir. 1999) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

1   cumulative effect of the harassing conduct.[13]   Generally speaking, "simple teasing,

2   offhand comments, and isolated incidents (unless extremely serious) will not amount to

3   discriminatory changes in the terms and conditions of employment."[14]   As ARMLS

4   observes and the Supreme Court has oft stated, Title VII does not set forth a "general

5   civility code" for the American workplace.[15]   On the other hand, a workplace that is

6   "permeated with discriminatory intimidation, ridicule, and insult" violates Title VII's

7   protections against discrimination.[16]

8          In order to survive summary judgment, Rich must show the existence of a

9   genuine factual dispute as to whether her workplace "was 'both objectively and

10  subjectively offensive, one that a reasonable person would find hostile and one that the

11  victim in fact did perceive to be so.'"[17]   Because ARMLS does not challenge Rich's

12  allegation that she was subjectively offended by her workplace conditions, the court will

13  focus on Rich's evidence of objective offensiveness.

14         Whether a working environment is objectively hostile or abusive "is not, and by

15  its nature cannot be, a mathematically precise test."[18]   No single factor is required; all of

16  the circumstances must be considered.[19]   These circumstances "may include the

17  frequency of the discriminatory conduct; its severity; whether it is physically threatening

18

19  _____

20         [13]*Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000).

21         [14]*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation omitted).

22         [15]*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Faragher v. City of
23  Boca Raton*, 524 U.S. 775, 788 (1998); *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S.
    75, 80 (1998).

24         [16]*Harris*, 510 U.S. at 21 (internal quotation omitted).

25         [17]*E.E.O.C. v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 997 (9th Cir. 2010) (quoting
26  *Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864, 871-72 (9th Cir. 2001)).

27         [18]*Harris*, 510 U.S. at 22.

28         [19]*Id.* at 23.

                                    -4-

1  or humiliating, or a mere offensive utterance; and whether it unreasonably interferes
2  with an employee's work performance."[20]

3      1.   **Cases where courts have applied the objective offensiveness test in the context of religion-based claims**

4      Neither party cites any cases where the Ninth Circuit applied the test for
5  offensiveness outlined above in the context of religion-based hostile environment
6  claims,[21] and the court found none that it may cite.[22]  Because this test is fact-
7  determinative, the court turns for guidance to cases from the Ninth Circuit's sister
8  circuits that specifically consider the aggregate offensiveness of religion-based
9  harassment.

10      a.   **Cases where the conduct was sufficiently offensive**

11      In *Venters v. City of Delphi*,[23] the plaintiff asserted a hostile work environment
12  claim based on her supervisor's repeated attempts to indoctrinate her with his born-
13  again-Christian religious beliefs.  The Seventh Circuit held that the supervisor's conduct
14  was sufficiently offensive to present the claim to the jury where the supervisor
15  (1) "repeatedly subjected [the plaintiff] to lectures (at work, during working hours) about
16  her prospects for salvation;" (2) "made highly personal inquiries into [the plaintiff's]
17  private life (whether there was truth to purported rumors that she entertained guests in
18  her home with pornography, for example);" and (3) told the plaintiff "that she led a sinful
19  life, that he was certain she had had sex with family members and possibly animals,

---

20  [20]*Id.*

21  [21]ARMLS cites: *Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir. 2000) (sexual
22  harassment) and *Kortan v. California Youth Auth.*, 217 F.3d 1104, 1106 (9th Cir. 2000) (gender-
23  based harassment).  Rich cites: *Westendorf v. W. Coast Contractors of Nevada, Inc.*, 712 F.3d
24  417, 421 (9th Cir. 2013) (sexual harassment) and *Pavon v. Swift Transp. Co.*, 192 F.3d 902,
25  908 (9th Cir. 1999) (race-based harassment).

26  [22]*See* 9th Cir. R. 36-3(c) (stating that unpublished dispositions and orders of the Ninth
27  Circuit that were issued before January 1, 2007 may not be cited by courts in this circuit except
    under circumstances that do not apply here).

28  [23]123 F.3d 956, 976 (7th Cir. 1997).

-5-

1   that she had sacrificed animals in Satan's name, and that committing suicide would be

2   preferable to the life he believed [the plaintiff] was living."[24]

3       In *Abramson v. William Paterson Coll. of New Jersey*,[25] the plaintiff was a college

4   professor who alleged a hostile work environment based on her Orthodox Jewish

5   beliefs and practices.  The Third Circuit reversed the district court's grant of summary

6   judgment in favor of the defendant where the evidence showed that over the course of

7   two years the defendant (1) engaged in "unprecedented" monitoring of the plaintiff's

8   conferences and absences; (2) charged her "with a sick day on a Jewish holiday when

9   she was not scheduled to teach"; (3) criticized her multiple times for not being available

10  during the Sabbath; (4) scheduled meetings on Jewish holidays and refused to change

11  them so that the plaintiff could attend; and (5) made the following "pointed statement" to

12  the plaintiff: "The trouble with you is that it doesn't show that you are Orthodox."[26]  The

13  Third Circuit stated that "[n]o one event alone stands out from the rest, but all of the

14  events could be found to aggregate to create an environment hostile to a person of [the

15  plaintiff's] religion."[27]

16      In *Shanoff v. Illinois Dep't of Human Servs.*,[28] the plaintiff's supervisor, during a

17  four-month period, (1) told the plaintiff that "she would see to it that [the plaintiff's] white

18  ass—[his] white Jewish ass would be kept down"; (2) told the plaintiff that it was "good"

19  that the plaintiff's health was failing; (3) prohibited the plaintiff from teaching medical

20  students; (4) affirmed that she "was going to be able to keep [his] white Jewish ass

21  down"; (5) again told the plaintiff that "she knew how to handle white Jewish males, and

22  once and for all that [he] needed to leave [his job] and get out of her hair"; (6) laughed

23

24  [24]*Id.*

25  [25]260 F.3d 265, 279-80 (3d Cir. 2001).

26  [26]*Id.* at 279.

27  [27]*Id.* at 280.

28  [28]258 F.3d 696, 704-06 (7th Cir. 2001).

1  and dismissed the plaintiff from her office after he told her that her conduct was

2  harming his health and career; and (7) called him at home to demand that he explain

3  his absence and, when the plaintiff asked her "why are you being like this," told him that

4  she hated "everything that [he was]."[29]  The Seventh Circuit found that the supervisor

5  "used her supervisory position to bully, intimidate and insult [the plaintiff] because of his

6  race and religion, which is the type of 'extreme' harassment that is the hallmark of a

7  hostile environment claim."[30]  Accordingly, it held that the plaintiff had "presented

8  sufficient facts to enable a reasonable jury to conclude that [the supervisor's]

9  harassment created an objectively hostile work environment."[31]

10        In *Feingold v. New York*,[32] the plaintiff alleged that he was subjected to anti-

11  Semitic treatment at work that included: (1) receiving inferior training; (2) being called

12  not by his own name but by other "Jewish-sounding names"; (3) in "nearly every"

13  conversation that took place in his presence a coworker "would say something about

14  his religion or hers or tell stories about a Jewish person"; (4) the same coworker stated,

15  "What's wrong with these [Jewish] people"?; (5) that same coworker "regularly

16  proclaimed 'Praise Jesus' and 'Hallelujah,' and asked other employees to join her in

17  these affirmations"; (6) another coworker described food that she ate as "Jewish pig

18  food"; and (7) Christian symbols were displayed in the office year-round.  The Second

19  Circuit held the plaintiff had established discrimination that was sufficiently frequent

20  (almost daily) and severe (stemming from anti-Semitic hostility) to allow a fact-finder to

21

22

23

24  _____

25  [29]*Id.* at 704-05.

26  [30]*Id.* at 705.

27  [31]*Id.* at 706.

28  [32]366 F.3d 138, 144 (2d Cir. 2004).

1  conclude that a reasonable employee in his position would have "experienced

2  pervasive discriminatory intimidation, ridicule, and insult because he was Jewish."[33]

3      In *E.E.O.C. v. Sunbelt Rentals, Inc.*,[34] the (1) defendant's employees spoke often

4  after the September 11, 2001 attacks about how the "Muslim religion is bad"; (2) the

5  plaintiff was "subject to repeated comments that disparaged both him and his faith";

6  (3) the plaintiff was "persistently harassed about his appearance, particularly his kufi

7  and beard"; (4) the plaintiff was harassed "several times" about "his short,

8  Sunbelt-sanctioned prayer sessions"; (5) the plaintiff's coworker "said that if he ever

9  caught [the plaintiff] praying upstairs, that would be 'the end of him'"; (6) a manager told

10 the plaintiff "that the United States should go to Saudi Arabia and 'kill them all,' referring

11 to Muslims in the Arab world"; (7) that same manager also said that "he wanted to be a

12 Muslim so he could have eight wives"; (8) after it was announced on television that the

13 D.C. snipers were apprehended, a coworker stared at the plaintiff and shouted, "I

14 should have known they were Muslims"; (9) an employee raised a metal detector to the

15 plaintiff's head garment and, "[p]resumably because the detector did not go off," called

16 the plaintiff a "fake ass Muslim want-to-be turbine [sic] wearing ass"; (10) an employee

17 told the plaintiff that when he is upset he should pretend a stapler was a model

18 airplane, implying that the plaintiff was connected with the September 11th terrorists;

19 (11) an offensive cartoon was posted in a main work area that depicted several persons

20 "dressed in Islamic or Muslim attire" as suicide bombers; (12) a Muslim customer of the

21 defendant testified that the defendant's employees "called him a litany of derogatory

22 names, including 'Bin Laden,' 'Hezbullah,' 'Ayatollah,' 'Kadaffi,' 'Saddam Hussein,'

23 'terrorist,' and 'sun nigger'"; (13) an employee said "very derogatory things about

24 Muslim people in general" to another Muslim customer, "and expressed his belief that

25 'all Muslims are associated with violence'"; and (14) coworkers "frequently hid [the

26

27     [33]*Id.* at 150.

28     [34]521 F.3d 306, 316-18 (4th Cir. 2008).

-8-

1  plaintiff's] timecard, unplugged his computer equipment, and defaced his business card

2  with terms such as 'dumb ass.'"  The Fourth Circuit held that the cumulative effect of

3  these incidents could support a hostile environment claim and reversed the district

4  court's grant of summary judgment in the defendant's favor.[35]

5      **b. Cases where the conduct was insufficiently offensive**

6    In *Hafford v. Seidner*,[36] the plaintiff was a member of the Muslim religion.  In

7  support of his region-based hostile work environment claim, he showed, among other

8  things, that: (1) during a meeting the plaintiff's supervisors "spoke in an offensive and

9  contemptuous manner about [the plaintiff's] Muslim faith and accused him of

10  participating in a holy war"; (2) the warden at the correction institution where the plaintiff

11  worked mocked a "Muslim greeting and falsely accused [the plaintiff] of preaching and

12  praying with the inmates because he permitted and responded to inmates' use of the

13  Muslim greeting"; (3) the deputy warden threatened the plaintiff "with loss of his job and

14  expressed concern about the effect of his religious expression on "[his] Aryan Officers";

15  (4) the warden "demanded that [the plaintiff] stop praying with the inmates and referred

16  to [the plaintiff's] religion in a contemptuous manner"; and (5) during a meeting the

17  plaintiff started to read to the warden from the Koran, to which the warden responded:

18  "That's the problem."[37]  The Sixth Circuit held that the plaintiff's evidence of religion-

19  based hostility was insufficient to warrant consideration by the jury.[38]  "The objections to

20  [the plaintiff] communicating with the inmates in Arabic as part of the Muslim greeting

21  appear to be a legitimate concern over fraternization of a correction officer with prison

22  _____

23    [35]*Id.* at 318 ("Any of the above incidents, viewed in isolation, would not have been

24  enough to have transformed the workplace into a hostile or abusive one.  No employer can lightly be held liable for single or scattered incidents.  We cannot ignore, however, the habitual

25  use of epithets here or view the conduct without an eye for its cumulative effect.").

26    [36]183 F.3d 506, 514 (6th Cir. 1999).

27    [37]*Id.* at 509-11.

28    [38]*Id.* at 513-14.

1  inmates," the court held.  And the court held that the defendant's specific comments did
2  not amount to a change in the terms and conditions of the plaintiff's employment as
3  they were mere "simple teasing, offhand comments, and isolated incidents."[39]

4        In *Williams v. Arrow Chevrolet, Inc.*,[40] the plaintiff claimed, among other things,
5  that he was subjected to a work environment that was hostile to Muslims.  He identified
6  two incidents in which his managers made offensive comments about religion: (1) a
7  manager "jokingly invited [the plaintiff] to a local restaurant operated by black Muslims
8  for pork chops, knowing that Muslims do not eat pork" and (2) a different manager saw
9  the plaintiff "speaking to a female customer dressed in traditional Muslim attire and later
10 asked [the plaintiff] 'what would happen if he pulled his dick out and shook it in her
11 face.'"[41]  The Seventh Circuit held that the plaintiff "could not convince a jury that [the
12 defendant] created a hostile work environment on account of his religion because the
13 plaintiff himself characterized the invitation to get pork chops as a "little joke" and
14 because "both this statement and [the other manager's] vulgar comment about the
15 female Muslim customer are better characterized as inappropriate and offensive
16 teasing than examples of abuse or hostility."[42]

17       In *Alansari v. Tropic Star Seafood Inc.*, the plaintiff was subjected to
18 (1) "solicitations to go to church because 'Jesus would save' him; (2) unspecified "other
19 comments about his Muslim religion"; and (3) "the playing of Christian music on the
20 radio."[43]  The Eleventh Circuit held that this conduct "may have been unwanted and
21 even derogatory," but was "more akin to 'mere offensive utterances' and not something

22

23 _____

24       [39]*Id.* at 514 (internal quotation omitted).

25       [40]121 F. App'x 148, 150-51 (7th Cir. 2005).

26       [41]*Id.* at 149.

27       [42]*Id.* at 150.

28       [43]388 F. App'x 902, 905 (11th Cir. 2010).

-10-

1  that unreasonably interfered with [the plaintiff's] work of loading his truck and delivering

2  his goods."[44]

3       Finally, in *Byrd v. Postmaster Gen.*, the plaintiff's co-worker, who was described

4  as "a fervent Christian," (1) sang religious songs, quoted religious scripture, preached

5  and spoke "about Church and the Bible" at the workplace; (2) referred to the plaintiff "as

6  the devil and Satan an unspecified number of times over a six-month period;" and

7  (3) informed the plaintiff "that she would go to Hell for not believing in Jesus on one

8  occasion."[45]  The Eleventh Circuit held that, even when these incidents were considered

9  in the aggregate, "a jury could not reasonably find that this conduct was sufficiently

10  severe and pervasive to be objectively hostile and abusive."[46]

11       **2.    Rich's evidence**

12       Rich cites the following events that she alleges, in the aggregate, establish a

13  genuine factual dispute regarding whether she experienced actionable religion-based

14  harassment at her workplace:[47]

15            **a.    Hoffman's offensive statement at a 2011 meeting**

16       Rich testified at her deposition that in a 2011 meeting Hoffman looked at her

17  "straight in the eye" and told her that she "was dead because [she] didn't reveal Jesus

18  to [herself]."[48]  Although Hoffman denies making this comment,[49] Rich's co-worker

---

[44]*Id.*

[45]582 F. App'x 787, 791 (11th Cir. 2014).

[46]*Id.*

[47]In addition to these events, Rich also cites evidence that tends to show that she was
passed up for promotions because she is Jewish.  This evidence is unavailing because hostile
work environment claims must be based on "*verbal or physical conduct* of a harassing nature."
*Swinton v. Potomac Corp.*, 270 F.3d 794, 807 (9th Cir. 2001) (emphasis added).  Further, the
court has already ruled that Rich's claims based on ARMLS' failure to promote her in 2008 are
time-barred by the applicable statute of limitations.

[48]Doc. 55-1 at 4 pp. 11:16-12:25.

[49]Doc. 48-3 at 29:9-12.

1   Shawna Hovis-Mayer ("Hovis-Mayer") testified that she witnessed this exchange, and

2   her description of it is consistent with Rich's.[50]

3               **b.   Harassment at office Christmas events**

4         Rich's co-worker Phyllis DeFino ("DeFino") testified that during the holiday

5   season ARMLS "had things from decorating cookies and making ornaments to

6   decorating Christmas trees and wreaths and poinsettias on people's desks and things

7   like that all surrounding the Christian holiday."[51]  DeFino testified that there were

8   carolers who sang "lots of religious" Christmas songs, not secular ones like "Frosty the

9   Snowman."[52]  Hovis-Mayer also testified that during the holiday season "Christianity

10  was displayed more than other religions."[53]

11        DeFino testified that she displayed a nativity scene at her desk every year during

12  the holiday season without being reprimanded by ARMLS.[54]  Conversely, according to

13  Rich, Consalvo told her that he "really didn't like" how she decorated her cubicle with

14  Hanukkah-related items.[55]

15              **c.   Discriminatory enforcement of the company email policy**

16        After the company's 2011 holiday party, Rich sent an email to all ARMLS

17  employees containing information about "[her] holiday" of Hanukkah.[56]  The email

18

19

20        [50]Doc. 55-1 at 26:15-24.

21        [51]*Id.* at 41:23-42:2.

22        [52]*Id.* at 43:7-14.

23        [53]*Id.* at 30:5-10.

24        [54]*Id.* at 42:10-11, 42:21-25, 43:1-6.

25

26        [55]*Id.* at 10 p. 69:4-18.  Consalvo testified that he merely told Rich "not to spend a lot of
    time or go overboard, as [he] did with a couple of employees, because [he] felt it inhibited
27  productivity in the workplace."  Doc. 48-3 at 12:8-11.

28        [56]Doc. 55-1 at 9 pp. 60:4-61:8.

-12-

1  describes the story of Hanukkah and various customs associated with the holiday.[57]  In

2  response to this email, Kari Kuyper ("Kuyper"), the company HR and Facility Manager,

3  informed Rich that her email violated company policy because it was a personal

4  communication that was not work related.[58]  The policy to which Kuyper referenced

5  arguably does not ban all personal emails: it merely states that employees "must

6  ensure that their personal use of the e-mail system does not interfere in any way with

7  [their] job duties or performance, [or] ARMLS's operation and does not violate any

8  ARMLS policies."[59]  According to Rich, Kuyper was enforcing the email policy in a

9  discriminatory manner because other employees were not reprimanded for using work

10  email to communicate about the Christianity-themed holiday party.[60]

11         **3.     Rich's evidence is insufficient**

12         Based on Rich's evidence, a jury could reasonably conclude that the comments

13  and actions of Hoffman, Consalvo, and Kuyper were objectively offensive expressions

14  of intolerance toward non-Christian religions, Judaism in particular.  But even if the jury

15  so concludes, ARMLS' words and actions are insufficient to raise a question of material

16  fact because they are neither severe nor pervasive enough to establish the "extreme"

17  level of discrimination that might change the terms and conditions of Rich's

18  employment.[61]  As ARMLS points out, most of Rich's evidence concerns "the brief

19

20

21         [57]Doc. 48-2 at 8-9.

22         [58]*Id.* at 8.

23         [59]*Id.* at 10.

24

25         [60]In her affidavit Kuyper states that she has "had similar communications on numerous
   occasions with other ARMLS employees who have sent out personal emails."  Doc. 48-1 at 3
26  ¶ 12.

27         [61]*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("We have made it clear that
   conduct must be extreme to amount to a change in the terms and conditions of employment,
28  and the Courts of Appeals have heeded this view.").

1   period comprising the 2011 holiday season."[62]  And Rich has presented no evidence

2   indicating that the nature of her work environment has unreasonably interfered with her

3   performance as an employee.  In sum, her evidence fails to establish a genuine factual

4   dispute regarding whether she experienced sufficiently offensive harassment.

5   **B.    Disparate Treatment**

6          Disparate treatment is where an employer "treats some people less favorably

7   than others because of their race, color, religion, sex, or national origin."[63]  For Rich to

8   establish disparate treatment, she must show that she (1) belongs in a class protected

9   by Title VII, (2) was qualified for the position, (3) was subject to an adverse employment

10  action, and (4) similarly situated individuals outside her protected class were treated

11  more favorably.[64]  Rich's disparate treatment claim alleges that ARMLS failed to

12  promote her to the following five positions because she is Jewish: (1) Support Services

13  Director (filled in 2008); (2) Director, Communications & Commerce (filled in January

14  2009); (3) Director of Education and Staff Development (filled in February 2010);

15  (4) Director, Communications, Business & Professional Development (filled in February

16  2010); and (5) Director of Support Operations (filled in July 2013).[65]  Rich concedes that

17  her claims related to all of these positions, except for Director of Support Operations,

18  are time-barred by the applicable statute of limitations.[66]

19         The Director of Support Operations position was given to non-Jewish employee

20  Paul Kriewall ("Kriewall") despite the fact that Rich was "very qualified" for the position,

21

22

23         [62]Doc. 56 at 6.

24         [63]*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).

25         [64]*Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1123 (9th Cir.
26  2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

27         [65]Doc. 1 at 5, 9; Doc. 55 at ¶ 67.

28         [66]Doc. 55 at 15 ¶¶ 69-70.

according to her own testimony.[67]  Rich has submitted no evidence, however, relating to Kriewall's qualifications.  At her deposition, when Rich was asked whether she was more qualified than Kriewall, she responded, "I think I'm well qualified.  I don't know about better.  I don't know anything about him.  I know that I'm very well qualified for it."[68]  Rich's claim fails because she has not established a genuine factual dispute regarding whether she was similarly situated to Kriewall.

**C.    Retaliation**

Finally, Rich claims that in 2014 Hoffman issued her an "unfounded poor [performance] review" in retaliation for the EEOC complaint that she filed.[69]  In this review Hoffman gave Rich a score of "Unacceptable" under the category of "Ability to plan and prioritize" based ostensibly on Rich's failure to timely respond to six specific emails.[70]  After Rich protested, the review was amended to remove reference to one of those emails.[71]  Rich herself admits "that she did not timely respond to at least some of the emails."[72]

To succeed on this claim, Rich must establish (1) "that she acted to protect her Title VII rights," (2) "that an adverse employment action was thereafter taken against her," and (3) "that a causal link exists between those two events."[73]  ARMLS first argues that Rich's performance review is not an adverse employment action because "no

---

[67]Doc. 55-1 at 15 p. 143.

[68]*Id.*

[69]Doc. 54 at 6; Doc. 55 at 21 ¶ 107.  The original review and an amended version is at docket 49-1 pp. 27-28 and 30-31, respectively.

[70]Doc. 49-1 at 27.

[71]Doc. 55 at 17 ¶ 78.

[72]*Id.*

[73]*Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir. 1994).

1   disciplinary action was ever taken against Rich" based on that review.[74]  The court has

2   already rejected this argument.[75]  ARMLS next argues that Rich cannot establish a

3   causal link between her negative review and her EEOC complaint.  In response, Rich

4   argues that there is "continuing antagonism by Hoffman toward Marcy" and cites a

5   lengthy email that Rich sent Kuyper in 2015 in which she outlines numerous Hoffman-

6   related grievances.[76]

7          "To show the requisite causal link, the plaintiff must present evidence sufficient

8   to raise the inference that her protected activity was the likely reason for the adverse

9   action.  Essential to a causal link is evidence that the employer was aware that the

10  plaintiff had engaged in the protected activity."[77]  Rich does not dispute that the reason

11  given for her poor review—her failure to timely respond to emails—is legitimate.

12  Instead, she appears to argue that this was a pretext for retaliation.[78]  But Rich's

13  evidence on that point is insufficient because her email merely shows her antagonistic

14  work relationship with Hoffman, not that the antagonism relates in any way to her EEOC

15  complaint.  Further, as ARMLS points out, this review occurred "approximately 17

16  months after she filed her discrimination charge against ARMLS," making the causal

17  connection between the two events even less tenable.

18

19

20

21          [74]Doc. 56 at 9.

22
           [75]Doc. 15 at 13 (citing *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000)
23  ("Among [the] employment decisions that can constitute an adverse employment action are . . .
    issuance of an undeserved negative performance review.")).
24
           [76]Doc. 48-4 at 19-20.
25

26          [77]*Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982).

27          [78]*See id.* (holding that "The order and allocation of proof for Title VII suits set forth in
    *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), is applicable to actions for
28  unlawful retaliation under [Section 704(a)].").

1

### V.  CONCLUSION

2       Based on the preceding discussion, ARMLS's motion for summary judgment at

3  docket 47 is **GRANTED**.

4       DATED this 5th day of January 2016.

5

6                                        /s/  JOHN W. SEDWICK
                                 SENIOR UNITED STATES DISTRICT JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28